❏ Original



CLERK'S OFFICE
A TRUE COPY
May 11, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. **21-M-376 (SCD)** |
| Information that is stored at premises controlled by Google concerning GAID #824920772550 | ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      5-25-21               *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.      ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Stephen C. Dries                      .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      5-11-21. 11:55 am                    *Stephen C. Dries*
                                                                                          *Judge's signature*

City and state:   Milwaukee, Wisconsin                          Stephen C. Dries, U.S. Magistrate Judge
                                                                                          *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

**<u>GRAND JURY MATTER NO. 2020R00324</u>**

**Property To Be Searched**

This warrant is directed to Google LLC and applies to:

(1) Location History data and all geofence advertising location data associated with

Google Advertising ID, Google Account ID, Google User ID, or Google Analytics ID

("GAID") #824920772550 for the following time period:

August 23, 2020 12:01 a.m. (CST) – August 25, 2020 11:59 p.m. (CST)

## ATTACHMENT B

**I.      Information to be disclosed by Google**

The information described in Attachment A, via the following process:

Google shall query location history data for GAID #824920772550 as described in Attachment A. The location data should be sourced from information including GPS data, cellular data, and information about visible wi-fi points and Bluetooth beacons transmitted from devices associated with GAID #824920772550, and should include latitudinal and longitudinal coordinates, dates, and times for GAID #824920772550, during the following time period:

August 23, 2020 12:01 a.m. (CST) – August 25, 2020 11:59 p.m. (CST)



CLERK'S OFFICE
A TRUE COPY
May 11, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information that is stored at premises controlled
by Google concerning GAID #824920772550

)
)
)
)
)
)

Case No. **21-M-376 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 844(n) and 844(i) | conspiracy to commit arson and arson affecting interstate commerce |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Digitally signed by ALEXIS KRUSIC (Affiliate)
DN: c=US, o=U.S. Government, ou=Dept of
Justice, ou=ATF,
0.9.2342.19200300.100.1.1=15001003962776,
cn=ALEXIS KRUSIC (Affiliate)
Date: 2021.05.11 11:09:34 -05'00'

Alexis Krusic, Task Force Officer (ATF)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:     05/11/2021

*Judge's signature*

City and state:  Milwaukee, Wisconsin

Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Alexis Krusic, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for information associated with a certain Google Advertising ID (also referred to as a Google Account ID, Google User ID, or Google Analytics ID) ("GAID"), that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Attachment B.

2.    I am a Task Force Officer with the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I am a Sheriff's Deputy with the Milwaukee County Sheriff's Office (MCSO). I have been employed with MCSO since January 2016 and a TFO since March 2020. My duties include investigating violations of the federal firearms, explosives, and arson statutes.

3.    I have completed approximately 920 hours of training at the Milwaukee County Sheriff's Office Training Academy through the Wisconsin Law Enforcement Standards Bureau. That training included various legal courses related to constitutional law and search and seizure authority. I have also received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4. I know from training and experience that individuals who commit crimes during riots commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media. I have previously applied for and received search and arrest warrants related to the crime of arson, as well as other crimes.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n), and arson affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i), as described in Attachment B.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

8. Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic

communications using the networks provided by cellular service providers. Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

9.     I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity. These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network. A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi. Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network. In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

10.     Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices, such as between a device like a cellular phone or tablet and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

11.     Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

12. Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

13. Based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (*e.g.,* Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (*e.g.*, Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed-in to their Google accounts. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (*e.g.*, example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed-in to a Google account.

14. Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

15. Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps

offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

16.     According to my training and experience, as well as open-source materials published by Google, I know that Google offers account users a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of a device's locations based on information transmitted to Google by the device. That Location History is stored on Google servers and is associated with the Google account associated with the device. Each Google account user may view his or her Location History and may delete all or part of that Location History at any time.

17.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data, wi-fi access points within range of the device, and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

18.     Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google account user must opt-in to Location History and must enable location reporting with respect to each specific device and application on which he or she uses the Google account for that usage to be recorded in Location History. A Google account user can also prevent additional Location History records from being created at any time by turning off the Location History setting for the user's Google account or by disabling location reporting for a particular device or Google application. When

Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising. As noted above, the Google account user also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into the user's Google account or by enabling auto-deletion of the Location History records older than a set number of months.

19.     Location data, such as that in possession of Google, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with.  Among other things, this information can indicate that a Google account user was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

20.     Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my

experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

21.     Additionally, Google assigns a unique identifier to each Google subscriber for advertising and marketing purposes.  This unique advertising identifier is known as the Google Advertising ID (also referred to as a Google Account ID, Google User ID, or Google Analytics ID) ("GAID"). Google is capable of capturing location data for specific accounts through GAID that is independent of the Location History feature. In fact, the GAID can capture location data even when the location services feature on a cellphone is disabled.

22.     Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (*i.e.,* session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## **PROBABLE CAUSE**

23.     On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The unrest and violence grew so

dangerous that the Wisconsin National Guard eventually deployed over 1,000 individuals to keep the peace. The Government also marshaled its resources to investigate crimes in the aftermath.

24.     ATF's National Response Team (NRT) and the Milwaukee Field Office, in partnership with the Kenosha Police Department, Kenosha Fire Department, Kenosha County Sheriff's Department, Drug Enforcement Administration, Wisconsin Department of Justice's Division of Criminal Investigation, and the United States Attorney's Office are focusing their efforts on identifying the persons responsible for twenty building arsons, seven vehicle arsons, and other related crimes that occurred in Kenosha between Sunday, August 23, 2020 and Tuesday, August 25, 2020. Those investigators processed scenes, collected video evidence, and identified potential witnesses, subjects, and targets. This warrant application is made as a part of this same investigative effort.

25.     In conjunction with other federal, state, and local law enforcement officers, I am assisting with an investigation into an arson at B&L Office Furniture, located at 1101 60th Street, in Kenosha, Wisconsin ("B&L"), on August 24, 2020. As part of the investigation into this arson at B&L, law enforcement reviewed a video publicly posted on the social media platform Twitter, which depicted a white male subject (wearing a black baseball cap, black tank top, blue surgical mask, and bearing a large left forearm tattoo, which itself featured a distinctive "straight edge" on the top) lighting a piece of material (believed to be either paper or cardboard) on fire, placing that same burning material on a table in front of B&L, and leaving the area.

26.     Law enforcement located additional footage of a person matching the description of the white male mentioned above, also generated in Kenosha on the evening of August 24, 2020. A still image generated using this same footage was released to the media, and citizens with any

knowledge of this person's identity were asked to contact law enforcement at an established "tip line."

27.     A citizen who wished to remain anonymous ("CW No. 1") contacted this "tip line" and advised that his son ("CW No. 2"), who also wished to remain anonymous, was familiar with the white male described above. CW No. 1 explained that CW No. 2 was connected on Facebook and Snapchat with a woman (later identified as Tabitha SCRUGGS ["SCRUGGS"]) whose boyfriend matched the picture released to the media. Law enforcement interviewed CW No. 2, at which point CW No. 2 (i) explained that SCRUGGS' Facebook profile name was "Tabby Abby"; and (ii) provided a still photo associated with that same Facebook profile, which depicted SCRUGGS' boyfriend Devon VAUGHN ("VAUGHN").  In the picture, VAUGHN is wearing the same hat as the B&L arsonist and displays a tattoo on his left forearm with a straight edge in the same location as the B&L arsonist.

28.     On September 3, 2020, law enforcement officers interviewed SCRUGGS outside of her grandmother's residence in Kenosha, Wisconsin. SCRUGGS's grandmother initially answered the door, at which point law enforcement asked if "Tabitha" lived at the residence. SCRUGGS's grandmother responded that they had just missed her.  SCRUGGS's grandmother eventually offered to call SCRUGGS. This call was placed, and SCRUGGS arranged to return to the residence.

29.     While waiting for SCRUGGS to return, law enforcement asked SCRUGGS's grandmother if she knew of SCRUGGS' boyfriend. SCRUGGS's grandmother said she did, and his name was Devon.  Law enforcement officers showed SCRUGGS's grandmother a picture of Devon, from SCRUGGS'S Facebook account, and asked SCRUGGS's grandmother if that was Devon, SCRUGGS'S boyfriend. SCRUGGS's grandmother said it was.

30.     When SCRUGGS returned to the residence, law enforcement interviewed her. Initially, SCRUGGS stated she went to downtown Kenosha by herself, but she eventually acknowledged going downtown with her friend Devon.  SCRUGGS claimed she did not know Devon's last name or cell phone number.  SCRUGGS stated she had known Devon for three months and that they had originally met through Facebook.

31.     SCRUGGS stated that Devon drove her, using her vehicle, to downtown Kenosha during the night of "the shooting" in Kenosha. She further stated that Devon continuously left her while they were downtown, and she was not around him for a majority of the time. SCRUGGS claimed she kept trying to call Devon because she wanted to leave, and Devon told her to just leave him if she did not want to stay. SCRUGGS ended up leaving Devon downtown because he did not want to leave.

32.     Later that day, law enforcement met again with SCRUGGS, at her request. Law enforcement showed SCRUGGS the photo of VAUGHN taken during the B&L arson, and asked SCRUGGS if she thought it was her boyfriend. SCRUGGS initially stated she did not know if that was him or not. After looking at the photo for a while, SCRUGGS stated the photo did "kind of" look like him, and that the hat and tattoo did look like Devon's.

33.     SCRUGGS and her counsel signed a "proffer letter" with the government, whereby SCRUGGS agreed to provide "a complete and truthful account of all information she has regarding all criminal wrongdoing perpetrated by herself or others." This "proffer letter" contained what is colloquially referred to as a "*Kastigar* waiver," which provided that the government was entitled "to use information derived directly or indirectly from [SCRUGGS'] statements for the purpose of obtaining and pursuing leads to other evidence, which derivative evidence may be used for any purpose, including any prosecution of her by the United States."

34. On October 15, 2020, SCRUGGS and her counsel met with the government for this proffer interview. Law enforcement does not believe that SCRUGGS was fully truthful during that conversation, but she did make certain statements that (i) the Government believes were truthful; and (ii) support the instant warrant application. To wit: SCRUGGS acknowledged entering the B&L furniture store with VAUGHN the night of the arson. SCRUGGS further stated that she personally saw VAUGHN start a fire inside the store.

35. During this same interview, the Government showed SCRUGGS a photograph (obtained from a publicly-available source) depicting the inside of the B&L furniture store the night of the arson. SCRUGGS acknowledged that (i) she was the female figure in the photo, and (ii) VAUGHN was the figure in the black tank top to the far left. SCRUGGS said she was either videotaping or watching the fire in this photo, and she initialed the photo to commemorate her identifications. A copy of the initialed photo follows:



36.     Based on analysis of various video surveillance footage, law enforcement officers

currently believe that VAUGHN entered the B&L that evening at approximately 9:33 PM (CST),

while the shirtless figure depicted above approached the B&L at approximately 9:30 PM (CST).

By 9:34 PM (CST), illumination—which eventually presents as fire— can be seen at B&L on

video surveillance.

37.     Law enforcement previously received computer-aided dispatch (CAD) data from the Kenosha Police Department regarding the Kenosha unrest. CAD is a method of dispatching emergency services vehicles, allowing dispatchers to view and understand the status of all units being dispatched, as well as provide displays and tools so dispatchers can handle calls-for-service as efficiently as possible. Upon review of this CAD data, law enforcement observed that on August 24, 2020 at approximately 10:37 PM CST, the Kenosha Police Department reported a fire at B&L.

38.     Law enforcement contacted Kevin Vaughn, Devon Vaughn's uncle, on September 3, 2020. Kevin Vaughn stated that Devon Vaughn would intermittently stay with him. Kevin Vaughn also stated that Devon Vaughn had two cellular telephones, one of which Kevin Vaughn knew was assigned call number (262) 234-1468.

39.     Investigators previously executed a search warrant for records and information from Verizon for Vaughn's cell phone number (262) 234-1468, which subsequently showed location information for the device on the night of August 24, 2020. Mapping of those locations showed that Vaughn's cell phone was using tower 209546, located at 4411 Sheridan Road in Kenosha, Wisconsin, which is located approximately 15 blocks from B&L Office Furniture between the hours of 2000 (8:00 CST) and 2359 (11:59 CST).  Cell phone tower 209546 is the closest tower to 1101 60th Street (B&L Office Furniture), the next closest cell phone tower to that location is approximately 18 blocks away.

40.     Investigators previously executed a search warrant for information associated with Devon Vaughn's Facebook profile, where Facebook subsequently provided an email address of Devonvaughn2017@gmail.com.

41.     Investigators submitted a subpoena to Google requesting the GAID associated with Vaughn's phone number (262) 234-1468 and email address Devonvaughn2017@gmail.com.

Google subsequently identified the relevant GAID as 824920772550.  The account was created on December 9, 2012 and active up to at least April 27, 2021.

## CONCLUSION

42.     Based on the foregoing, I request that the Court issue the proposed search warrant.

43.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Google.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

## GRAND JURY MATTER NO. 2020R00324

### Property To Be Searched

This warrant is directed to Google LLC and applies to:

(1) Location History data and all geofence advertising location data associated with

Google Advertising ID, Google Account ID, Google User ID, or Google Analytics ID

("GAID") #824920772550 for the following time period:

August 23, 2020 12:01 a.m. (CST) – August 25, 2020 11:59 p.m. (CST)

## ATTACHMENT B

**I.     Information to be disclosed by Google**

The information described in Attachment A, via the following process:

Google shall query location history data for GAID #824920772550 as described in Attachment A. The location data should be sourced from information including GPS data, cellular data, and information about visible wi-fi points and Bluetooth beacons transmitted from devices associated with GAID #824920772550, and should include latitudinal and longitudinal coordinates, dates, and times for GAID #824920772550, during the following time period:

August 23, 2020 12:01 a.m. (CST) – August 25, 2020 11:59 p.m. (CST)